**Robert R. HENN, et al.,
Plaintiffs-Appellants,**

**v.**

**NATIONAL GEOGRAPHIC SOCIETY,
Defendant-Appellee.**

**No. 86–2635.**

United States Court of Appeals,
Seventh Circuit.

Argued April 10, 1987.

Decided May 29, 1987.

Rehearing and Rehearing En Banc
Denied July 2, 1987.

Wilfred F. Rice, Jr., Chicago, Ill., for plaintiffs-appellants.

Morgan D. Hodgson, Steptoe & Johnson, Washington, D.C., for defendant-appellee.

Before BAUER, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Experiencing a decline in advertising, the National Geographic Society decided to reduce the number of employees selling ads. The Society offered every ad salesman over age 55 the option of early retirement. The Society made the offer in June 1983; the recipients had more than two months to think it over. The Society offered: a severance payment of one year's salary, retirement benefits calculated as if the retiree had quit at 65, medical coverage for life as if the employee were still on the payroll, and some supplemental life insurance coverage. The letter extending the offer stated that this was a one-time opportunity. Twelve of the fifteen recipients took the offer; the three who declined are still employed by the Society. All twelve have received the promised benefits. Four of the twelve filed this suit, contending that their separation violated the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34.

The district court granted summary judgment to the Society. It concluded that early retirement violates the ADEA only if the alternative is "constructive discharge" —that is, working conditions so onerous or demeaning that the employee has effectively been fired in place and compelled to leave. See *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 314 (7th Cir.1986); *Brown v. Brienen*, 722 F.2d 360, 365 (7th Cir.1983). The court thought it undisputed that plaintiffs' working conditions were unchanged from what they had always been; there was pressure to perform and dark hints that failure to sell more ads would have unpleasant consequences, but the judge concluded that these went with the territory. Each person's decision to retire was his own, and any pressure he felt was the product of the downturn in sales and the risks of a salesman's job.

The plaintiffs' brief on appeal is principally devoted to insisting that there was enough evidence of constructive discharge to require a trial. The case has been complicated, however, by *Paolillo v. Dresser Industries, Inc.*, 813 F.2d 583 (2d Cir.1987), which holds that *every* retirement under an early retirement plan creates a prima facie case of age discrimination, and that the employer must show both that the details of the plan have solid business justification and that each decision to retire is "voluntary"—by which the Second Circuit apparently meant "without undue strain". If *Paolillo* correctly interprets the ADEA, this case must be tried. We conclude, however, that the parties and the district court, rather than *Paolillo*, took the right approach. Only a constructive discharge, where an actual discharge would violate the ADEA, supports a claim of the sort plaintiffs pursue.

To determine the proper treatment of early retirement, we start by assuming that the employer is complying with the ADEA. (Whether the Society was doing so is a question to which we return.) Now the employer adds an offer of early retirement. Provided the employee may decline the offer and keep working under lawful conditions, the offer makes him better off. He has an additional option, one that may be (as it was here) worth a good deal of money. He may retire, receive the value of the package, and either take a new job (increasing his income) or enjoy new leisure. He also may elect to keep working and forfeit the package. This may put him to a hard choice; he may think the offer too good to refuse; but it is not Don Corleone's "Make him an offer he can't refuse." "Your money or your life?" calls for a choice, but each option makes the recipient of the offer worse off. When one option makes the recipient better off, and the other is the status quo, then the offer is beneficial. That the benefits may overwhelm the recipient and dictate the choice cannot be dispositive. The question "Would you prefer $100,000 to $50,000?" will elicit the same answer from everyone, but it does not on that account produce an "involuntary" response.

Section 4(a)(1) of the ADEA, 29 U.S.C. § 623(a)(1), makes it unlawful to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age". Because an offer of early retirement is valuable, the sort of thing

many people would pay to receive, it might be thought to "discriminate against" those who do not get the offer. But people under 40 are not protected by the ADEA, 29 U.S.C. § 631(a), and some distinctions within the group of employees 40 and over are allowed by § 4(f)(2), which permits an employer "to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of [the ADEA]". This section allows distinctions to be drawn on account of age when, for example, calculating insurance premiums. The employer may charge older employees more for term insurance; the employer may offer lower monthly payments to employees who retire early. Such plans have sound actuarial foundations, and § 4(f)(2) permits their use. The employer also may make decisions based on seniority, even though seniority correlates with age. Several cases, including *Paolillo*, have assumed that an early retirement plan that excludes some people in the protected age group must be examined under § 4(f)(2), which requires the employer to show both a sound business purpose for the structure of the plan and the absence of "subterfuge". E.g., *Cipriano v. Board of Education*, 785 F.2d 51 (2d Cir.1986); *Patterson v. Independent School District*, 742 F.2d 465 (8th Cir.1984). See also 29 C.F.R. § 860.120(a)(1), discussing the function of § 4(f)(2) and the burden it imposes on employers. (The legislative history of § 4(f)(2) is discussed in *EEOC v. Borden's, Inc.*, 724 F.2d 1390, 1395–96 (9th Cir.1984).)

▮ Section 4(f)(2), however, is a defense. The employer need not mount a defense unless the employee makes out a prima facie case. An employee excluded from the early retirement plan (as in *Cipriano*, which excluded employees 60 and over), or treated adversely under it (as in *Patterson*, dealing with a plan whose benefits diminished with age), has stated a claim of discrimination. An employee to whom the offer has been extended—such as our four plaintiffs—is the beneficiary of any distinction on the basis of age. None can claim to be adversely affected by dis-

crimination in the design or offer of the early retirement package. Cf. *Dorsch v. L.B. Foster Co.*, 782 F.2d 1421, 1427–29 (7th Cir.1986). So in a suit by someone in the *favored* group, § 4(f)(2) never comes into play.

*Paolillo* concluded, however, that retirement under an early retirement plan is a prima facie case of age discrimination against the person who retires. That forced the employer to rely on § 4(f)(2), the Second Circuit believed, and it added an obligation that the employer not only justify the structure of its plan but also show that each decision to retire was "voluntary" in the sense of "without undue mental strain". The court thought this a natural interpretation of *Cipriano*. It is not, because *Cipriano* dealt with people excluded from the plan. The discrimination against the plaintiff called for explanation; there was no similar discrimination against the plaintiff in *Paolillo*. The Second Circuit also disregarded several earlier cases that had held that early retirement is not the basis for an inference of discrimination. E.g., *Gray v. New England Telephone & Telegraph Co.*, 792 F.2d 251, 255 (1st Cir. 1986); *Coburn v. Pan American World Airways, Inc.*, 711 F.2d 339 (D.C.Cir.1983); *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66 (6th Cir.1982). These courts treated offers of early retirement benefits in the way we have found natural—as favors to the older employees, about which they cannot complain. See *Diamond*, 670 F.2d at 71 ("Diamond appears to have been rather generous with Ackerman. Rather than simply terminating him or switching him to a lower paying or less prestigious job, Diamond offered him an opportunity to retire with dignity."); *Coburn*, 711 F.2d at 344 (early retirement "is a humane practice" that "supports not a hint of age discrimination."). *Paolillo* created a conflict among the circuits.

In characterizing retirement under an early retirement program as presumptively discriminatory, *Paolillo* overlooked the regulation governing early retirement plans, 29 C.F.R. § 1625.9(f). This provides: "Neither section 4(f)(2) nor any other provi-

sion of the Act makes it unlawful for a plan to permit individuals to elect early retirement at a specified age at their own option." This plausible construction of the ADEA is entitled to considerable weight where, as here, Congress never considered the matter. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). The legislative history of the ADEA is unilluminating about early retirement plans. Given that, § 1625.9(f), and the fact that the offer of early retirement is beneficial to the recipient, there is no reason to treat every early retirement as presumptively an act of age discrimination.

■ The "prima facie case" in the law of discrimination is a shorthand for the constellation of events that raises a suspicion of discrimination—enough so to require the employer to explain his conduct. See *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). When a court can identify some circumstances that "give rise to an inference of unlawful discrimination" (*Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094) it may treat similar circumstances as creating a presumptive case of discrimination in the future. When similar circumstances would not support an inference, they should not be treated as a prima facie case of discrimination. *Mason v. Continental Illinois National Bank,* 704 F.2d 361, 364–66 (7th Cir.1983). Retirement is an innocuous event, coming once to many employees and more than once to some. Retirement is not itself a prima facie case of age discrimination, not unless all separations from employment are. And as we have explained, an offer of incentives to retire early is a benefit to the recipient, not a sign of discrimination. Taken together, these two events—one neutral, one beneficial to the older employee—do not support an inference of age discrimination. We agree with *Coburn* and *Diamond* that an

early retirement package is a boon; we therefore must disagree with *Paolillo*'s conclusion that early retirement presumptively establishes age discrimination.

■ What distinguishes early retirement from discharge is the power of the employee to choose to keep working. This must mean a "voluntary" choice. But what does "voluntary" mean? We could ask, as the court did in *Paolillo*, whether the employee had enough time to mull over the offer and whether the choice was free from "pressure". (In *Paolillo* the employees had less than a week, which the court thought suspiciously short.) Yet the need to make a decision in a short time, under pressure, is an unusual definition of "involuntary". A criminal defendant may be offered a plea bargain on a take-it-or-leave-it basis, knowing that if he does not act quickly the prosecutor may strike a deal with another defendant instead; the need to act in haste does not make the plea "involuntary" if the defendant knows and accepts the terms of the offer. A suspect being interrogated may confess in a flash; his naiveté and the shortness of time do not make the confession involuntary. "Involuntariness" is a term of art dealing with certain tactics that the Constitution places off limits to interrogators. *Colorado v. Connelly,* — U.S. ——, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473 (1986). A commodities trader may have only seconds to buy or sell huge quantities in response to movements in price; neither the shortness of time nor the fear of financial loss would enable the trader to undo as "involuntary" choices that turned out, in retrospect, to be unhappy. An employee offered a new job with higher pay (good) in a new city (bad) may have only a short time to decide; neither the brevity of the time nor the difficulty of the choice makes the decision "involuntary".

The "voluntariness" question in these and many more examples of important choices turns on such things as: did the person receive information about what would happen in response to the choice? was the choice free from fraud or other misconduct? did the person have an opportunity to say no? A very short period to

make a complex choice may show that the person could not digest the information necessary to the decision. This would show that the offer of information was illusory and there was no informed choice. But when the employee has time to consult spouse and financial adviser, the fact that he still found the decision hard cannot be decisive. A person contemplating an offer of early retirement may find the choice hard because *both* options—continued employment and early retirement—are desirable. The high value of each option hardly calls the voluntariness of the choice into question, however.

■ The plaintiffs in this case do not say that they lacked information about the terms of the offer. All had time to discuss the offer with families and financial advisers. They complain that they felt pressure and perceived the choice to be excruciating, but that is not important. They could prevail only by showing that the Society manipulated the options so that they were driven to early retirement not by its attractions but by the terror of the alternative. If the terms on which they would have remained at the Society were themselves violations of the ADEA, then taking the offer of early retirement was making the best of things, a form of minimization of damages. Suppose, for example, that one of the plaintiffs expected to earn $200,000 in his remaining time at the Society, but the Society (in violation of the ADEA) had just cut his salary because of his age, so that he now could expect no more than $100,000. This employee would snap up an early retirement package worth $110,000, but might reject the same package had he been allowed to work at his old wage. (Whether he would take the package would depend on the earnings he could expect from other employment.) The decision to reduce one's injury from the employer's violation of the ADEA would not prevent a suit seeking to recover the remainder of the loss. But putting the point in this way reveals the appropriate question in early retirement cases—whether the existing conditions (ignoring the offer of early retirement) violate the ADEA. If they do, then the employee may recover for that violation whether or not he took the package of benefits (though the value of the package would be taken into account in computing damages).

The four plaintiffs set out to show that the Society had "constructively discharged" them by making their lives miserable, which induced them to take the offer. Showing this would not be enough. If the Society could have discharged them lawfully—perhaps because business had turned sour, and these four were not selling enough to cover their wage—then the fact that it may have discharged them "constructively" instead would be unimportant. A generous reading of the plaintiffs' papers treats them as maintaining that an actual discharge would have been unlawful.

The district court held that none of the four had been discharged, actually or constructively. "An employer constructively discharges an employee only if it '*makes* an employee's working conditions so intolerable that the employee is forced into an involuntary resignation' ". *Bartman,* 799 F.2d at 314 (emphasis supplied by *Bartman;* citations omitted). Some courts have added a requirement that the employer manipulate the attributes of the job for the purpose of driving the employee to quit. E.g., *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985). We need not decide whether to follow these decisions.

The plaintiffs complain of two things that made their positions untenable: the "silent treatment" and threats (real and implied) of unpleasant consequences if they did not start selling more ads. The "silent treatment" was principally that no one in the Society would tell them whether they ought to take the offer of early retirement; the Society says this was caused by its policy of sticking to the facts (doubtless to avoid charges of placing undue pressure on the employees), while the plaintiffs say that their inability to get straight answers about whether they should take the offer led them to fear the worst. The threats came about because all four plaintiffs had experienced bad years, and their supervi-

sors told them they needed to sell more ads; this led them to fear for their jobs.

The record contains extensive admissions by the plaintiffs tending to support the district judge's conclusion that any threats made to these plaintiffs while they were considering the offer were no greater than justified by their lack of sales. Selling is a risky profession, and it does not make a salesman's job unbearable to remind him that he must produce and that there are penalties for failure. The plaintiffs say, however, that the Society's warnings were not justified on a more complete review of their performance. They also believe that the Society hassled them more than their sluggish sales performance warranted. To support this belief Henn states that Bill Hughes, his supervisor, said to him early in 1983: "[s]ome of you older guys will not be around at the end of the year". All four plaintiffs rely on a passage in a memorandum that was part of the bureaucratic process that ended in the offer of early retirement: "Of the total twenty sales members one out of two are over 55 years, six are over age 62 and four are presently over age 65. [sic: actually 5 under 55; 5 between 55–61; 6 from 62–65; 4 over 65] Only one sales person over 65 plans to retire this year and an undetermined number desire to continue toward age 70. If an age balance is not struck soon our average age will obviously increase. Serious repercussions will result if younger sales personnel are not available to cultivate clients in new growth industries and insure future sales. To attract youthful qualified sales personnel we must be cognizant of industry practices and offer required incentives." The author of the memo recommended that salesmen be fired; the Society did not take that advice. It maintains that neither comment supports an inference that it acted or would have acted improperly to any person on the payroll.

The district court concluded that neither these nor other comments and incidents added up to constructive discharge or supported a reasonable belief by the plaintiffs that, had they remained at the Society, they would have been fired unlawfully. They were at risk of discipline or discharge for their performance (or lack of performance), and all four were producing less than their quota. The Society turned down the recommendation that it fire people, so the author of the memorandum did not speak for the Society. And although the record may well support an inference that the Society wanted to reduce the average age of its sales staff, this does not show that it used illegal means. Any early retirement program reduces average age, because only older employees are eligible to retire. That the Society favored the results of its program does not condemn the program. We passed that point when we accepted the conclusion of the EEOC, stated in 29 C.F.R. § 1625.9(f), that early retirement programs do not violate the ADEA. See also *Kier v. Commercial Union Insurance Cos.*, 808 F.2d 1254, 1258 (7th Cir.1987) (the fact that a reduction in force reduces the average age of the remaining employees does not support an inference that a particular employee was fired because of age).

■ The argument based on constructive discharge depends not on the Society's beliefs about the effects of retirements but on what it communicated to the employees. The district court properly concluded that salesmen must endure adverse reactions and other signs of displeasure when their productivity falls off. An employer's communication of the risks of the job does not spoil the employee's decision to avoid those risks by quitting. Were it otherwise, any employee about whom there was dissatisfaction would have a jury case under the ADEA, even if the dissatisfaction were supported by objective indicators (such as low productivity). In passing on a motion for summary judgment, a court must indulge inferences in favor of the non-moving party, but it need not indulge all possible inferences. The reasonable inferences from this record would not allow a jury to infer that the plaintiffs would have been fired (in violation of the ADEA) had they turned down the offer of early retirement, and without such a constructive discharge they cannot undo their choice to retire.

One final matter. The plaintiffs' brief in this case was larded with citations to materials that were not before the district judge when he passed on the motion for summary judgment. The Society filed a motion to strike the offending material, to which the plaintiffs' counsel replied that it was proper to refer to depositions and the like—even without filing them in the district court or drawing the district judge's attention to them—when appealing from a grant of summary judgment. Counsel is wrong. See Fed.R.App.P. 10(a) (only materials filed with the district court are in the appellate record) and Circuit Rule 10 (same). The parties may rely on appeal only on materials furnished to the district judge. Otherwise they deprive the opposing party of an opportunity to comment on them and the district judge of an opportunity to evaluate their significance. Storing up depositions for use on appeal might produce unnecessary motion, if the materials would have persuaded the district judge (as the plaintiffs thought they would persuade us). Parties who designate and file parts of a deposition for a district judge's consideration must be aware that the remainder of the deposition is not in the record on appeal.

Instead of granting the motion to strike, we instructed counsel for the plaintiffs to file a new brief, shorn of the offending matter. Despite promising to furnish the brief promptly, counsel took 36 days after oral argument to do so. We were just about to strike all factual allegations in the original brief when the redacted brief appeared. Counsel who disregard the record and then tarry in making amends are playing with fire.

AFFIRMED