**Kenneth R. WALKER, Plaintiff,**

v.

**The MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, Defendant.**

**Civ. A. No. 84–M–790.**

United States District Court, D. Colorado.

March 11, 1988.

Martin Zerobnick, Richard G. Sander, Zerobnick & Sather, P.C., Curtis L. Kennedy, Denver, Colo., for plaintiff.

Dirk W. de Roos, Elizabeth A. MacDonald, Kutak Rock & Campbell, David T. Fisher, Mountain Bell Law Dept., Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

This age discrimination class action under 29 U.S.C. § 216(b) is based upon an

EEOC charge filed by the plaintiffs' named representative, Harry C. Drake. Drake asserted in that charge that 1) he was a first assistant manager of distribution services at Mountain Bell; 2) he was advised that he had been declared surplus on November 18, 1982; 3) he was offered a position that was a "considerable downgrade;" 4) he was told he had the alternative of retiring, was offered and elected to receive the company's Supplemental Income Pension Plan (SIPP); and 5) his job functions were still being performed at the company by three employees, all under age forty (but under a different job classification). He contended that the company failed or refused to reclassify him and retain him in the job. On August 14, 1987, the defendant moved for summary judgment arguing that Drake has failed to establish a prima facie case of age discrimination. Mountain Bell asserts that even if Drake has established a prima facie case, he has failed to show that Mountain Bell's articulated non-discriminatory reasons for relocating and demoting Drake are pretextual. On September 23, 1987, the plaintiff filed a response to defendant's motion to which the defendant filed a reply on October 27, 1987. This court heard oral argument on defendant's motion for summary judgment on February 17, 1988.

The parties agree on the following facts: Plaintiff Harry C. Drake was employed by Mountain Bell in Albuquerque, New Mexico from November 3, 1952 to December 29, 1982. Plaintiff's date of birth is July 12, 1929. Drake was employed as a non-management or "craft" employee from November 1952 until his promotion to a first level management position in 1970. For approximately eighteen months prior to his retirement, Drake held the position of Assistant Staff Manager, a first level management position, in Network Distribution Services.

Network Distribution Services is the department within Mountain Bell responsible for the engineering, construction, installation and maintenance of the telephone hardware used to connect telephone subscribers to Mountain Bell's switching offices and switching offices to one another.

The first level of management at Mountain Bell is the lowest of six management levels. There are three "bands" or tiers within the first level of management, level "1-1" positions, level "1-2" positions and level "1-3" positions. Drake held a job at the highest tier of first level management, a level 1-1 position, prior to his retirement.

Drake's job within the Network Distribution System at Mountain Bell was in the field of electronic carrier or "pair gain." Pair gain is the modern technology which converts analog signals (i.e., the human voice) to digital signals and then back again to analog signals. Drake describes his position as a "Loop Electronic Scheduler in Local Loop Design Engineering." During 1982 the Network Distribution Services (NDS) department began a transition involving the transfer of electronic carrier or "pair gain" functions from another department, Network Switched Services, to the NDS department. Following the transfer of pair gain functions, NDS initially treated pair gain functions or responsibilities as a specialized or "state staff" function, as opposed to a function of the two NDS engineering "districts". During the fall of 1982, NDS decided to disband some "state staff" functions, including pair gain, to the various NDS districts.

At that time, there were seven NDS "districts" in New Mexico, each under the supervision of a district manager, as follows:

| district | district manager |
|---|---|
| Installation and Maintenance—Metro | Jon Shumard |
| Installation and Maintenance—North | Harold Nicholson |
| Installation and Maintenance—South | Dick Brittain |
| Construction—South and Metro | Wallace Herman |
| Construction—North | Paul Johnson |
| Engineering—North; Assignment—Metro, North and South | William Wallace |
| Engineering—South and Metro | Charles Hubbard |

In early November 1982, Mountain Bell announced that several departments, including Network Distribution Services, would be reconstructed by January 1, 1983. The reorganization of NDS involved changing from a three region structure comprised of central, northern and southern regions to a two region organization, with a north and south area. The new south area would be composed of Arizona, New

Mexico and Utah, with area headquarters located in Phoenix. As reported in a November 23, 1982, Mountain Bell Newsletter, "[t]he change was made to ensure a greater degree of flexibility needed to make quick responses to the many changes coming in the company, to continue working toward objectives for increasing management span of control, to improve efficiency and streamline operations to meet the service and earning needs of the company." Affidavit of Roy Stage with attachments.

In addition to that company-wide reorganization of NDS which became effective in approximately January 1983, the engineering functions within NDS in New Mexico were restructured with new reporting alignments and job responsibilities for several hundred NDS engineering employees. It also resulted in the downgrading of some management employees and the promotion of some non-management personnel into mid-level (level "1–2") management positions.

From approximately July through September 1982, while working in a "state staff" capacity, Mr. Drake reported to Neel G. Roch, a second level manager in Albuquerque in the NDS district then known as "Engineering—Metro and South." Mr. Roch's date of birth is March 1, 1942. During the months that Drake reported to Roch, his primary responsibilities were (1) foreclosing of plug-in units; (2) tracking the cost of pair gain projects; and (3) coordinating job authorization with the Network Switched Services department. Drake states that Roch talked "down about me in front of my subordinates as if to be trying to demoralize me." Drake Affidavit, ¶ 8. Drake states that Roch once said to him in a demeaning and derogatory manner, "All you old guys are alike." Drake Affidavit, ¶ 8.

In approximately October 1982, as a result of the departmental decision to disband some state staff functions, including pair gain planning and engineering, to the various NDS districts, plaintiff was assigned to report to second level manager Kim Mauldin Hahn, and third level or "district" manager William T. Wallace, located in Santa Fe. Wallace was responsible for the district then known as "Engineering—North; Assignment—Metro, South and North." When plaintiff began reporting to Ms. Hahn and Mr. Wallace in the "North" engineering district, Drake's pair gain responsibilities included the northern area of New Mexico only. Drake states that during the period he reported to Mauldin "that Mauldin was particularly trying to ignore me.... Mauldin would not show up for scheduled meetings after I had travelled all the way from Albuquerque to Santa Fe to meet with her as previously planned.... Mauldin would not return my phone calls. I might get one call out of ten returned." Drake Affidavit, ¶ 13.

Prior to the engineering reorganization in fall of 1982, all of the engineering planning functions within Wallace's "north" district were based in Santa Fe. As part of the engineering reorganization, Kim Mauldin Hahn and Wallace, plaintiff's second and third level supervisors, determined that the north planning group should remain in Santa Fe and that plaintiff's pair gain functions should be moved to Santa Fe. Wallace and Hahn intended that a portion of plaintiffs responsibilities would be assigned to Carlos G. Martinez, a 39 year old first level (level 1–1) manager under their supervision who was then involved in pair gain planning in Santa Fe. The remaining portion of plaintiff's functions would be performed by plaintiff in Santa Fe as a level 1–2 manager in pair gain design engineering. As a result of the engineering reorganization, both Carlos Martinez and plaintiff were to be downgraded within the first level of management from level 1–1 to level 1–2 positions.

On November 22, 1982, Hahn and Wallace came to Albuquerque from Santa Fe to meet with Drake to explain how the engineering reorganization would affect his job. During that meeting, Wallace advised Drake that, as a result of the reorganization, his job would be located in Santa Fe, New Mexico and would be downgraded from a level 1–1 to a level 1–2 position. Mountain Bell and Drake disagree about what else was said at the November 22,

1982 meeting. Mountain Bell asserts that Wallace did not advise Drake what the salary would be for the Santa Fe position. Drake submitted an affidavit with his response to defendant's motion for summary judgment, and in it states that Wallace told him that the demotion "would mean eventually a substantial pay decrease." Drake Affidavit, ¶ 18.c. Had Drake accepted the Santa Fe first level position, his salary would not have been reduced for twelve months following the transfer, in accordance with Section 17 of Mountain Bell's Human Resources Guide. As a management employee of Mountain Bell, Drake had been provided with his own copy of the Human Resources Guide. After twelve months in the Santa Fe job, plaintiff's salary ($33,784) would have been adjusted, depending upon his management performance rating at that time, to an annual salary of no more than $35,280 and no less than $29,400.

Mr. Wallace told Mr. Drake, during the November 22, 1982 meeting, that he could take retirement with benefits under the non-management plan known as Supplemental Income Protection Plan (SIPP). Under SIPP, Mr. Drake would receive a total of $18,000, paid in monthly installments over a four year period. To retire with SIPP benefits, Drake had to agree to retreat on paper for one day to a non-management job title and receive pension benefits under the non-management pension plan.

As of November 22, 1982, Drake was eligible to retire with pension benefits under Mountain Bell's management pension, but his pension benefits would be discounted 3% per year (or .25% per month) if plaintiff were to retire prior to age 55. Had plaintiff retired in December 1982, with benefits under the management pension, his pension would therefore have been subject to a 4.75% discount or penalty since he would not reach age 55 until July 1984.

During the meeting on November 22, 1982, Mr. Drake advised Mr. Wallace and Ms. Hahn that he did not want to commute to Santa Fe or accept a demotion, and according to Mr. Drake, Mr. Wallace then told plaintiff that "Well, I guess I don't blame you. You really don't have a choice. Take the SIPP retirement and get out. SIPP is offered now and it isn't going to get better. It should be clear which is the best choice. You'd be a fool not to take SIPP! Retirement with SIPP is the only thing you have going for you." Drake Affidavit, ¶ 19. Drake states that he requested some time to make his decision but that Wallace insisted on having Drake's decision immediately. According to Drake, Wallace stated "What the hell is there to think about. It should be clear which is the best choice! You can tell me right now! You know which is the best way to go!" Drake Affidavit, ¶ 20. Drake advised Wallace that he would retire with SIPP benefits, and Wallace stated "Well good—that settles it—I'll go tell the big boss, the higher-ups!" Drake Affidavit, ¶ 20.

Drake executed a Mountain Bell form requesting retirement with SIPP benefits on December 15, 1982, and completed a company "Application for Pension" form on December 22, 1982. Drake designated February 20, 1983, as his retirement date. On Drake's "Application for Pension" form, Mountain Bell indicated that Drake's retirement was due to "force surplus."

Drake took his last scheduled week of vacation for 1982 during the last week of December 1982. Drake states that on December 29, 1982, he received a phone call at his residence from Human Resources Supervisor Dorothy Dahl who stated that "Roy Stage (the Department Division Manager) wants you to be retired by December 31, 1982." Drake claims that he said to Dahl, "he can't expect that, I've submitted my papers with a retirement date in February. How can this happen? He can't change my retirement date just like that!" Dahl's reply, "Well, I don't know" ended the conversation. Drake Affidavit, ¶ 26.

Drake reported to work on January 3, 1983 and performed all his usual job duties. He also worked all of January 4, 1983 when he went to Estancia, New Mexico to clear Carrier Engineering problems with network engineers. At the end of the workday on January 4, 1983, Drake got a mes-

sage that district level manager Larry Hahn wanted to see him. At 5:15 p.m. on January 4, 1983, Hahn told Drake: "You're not supposed to be here. The company retired you on December 30th. You're not supposed to be working here anymore and the company is not going to pay you for the work you've done these last two days. Don't come back here anymore because you're retired." Drake did not report to work again. Drake Affidavit, ¶ 28.

In 1983, after the reorganization of NDS, there were five districts in New Mexico, with realigned areas of responsibility. The post-reorganization districts were as follows:

| district | district manager |
| --- | --- |
| Installation and Maintenance—Metro | Jon Shumard |
| Installation and Maintenance—Outstate | Harold Nicholson |
| Construction—New Mexico | Paul Johnson |
| Engineering and Assignment—Metro | Charles Hubbard |
| Engineering and Assignment—Outstate | Larry Hahn |

In each of the reorganized districts, "Engineering and Assignment—Metro" and "Engineering and Assignment—Outstate," there were first level managers responsible for pair gain planning and first level managers responsible for pair gain design engineering.

Drake's district level manager, Wallace, who had been in charge of the district which included Engineering—North and Assignment—Metro, South and North, retired at the end of December 1982. Mr. Larry Hahn, a district level manager in NDS in Denver, became the district manager for the new Engineering and Assignment—Outstate district. As a result, the Engineering—North planning functions previously based in Santa Fe under Mr. Wallace's supervision were moved to Albuquerque, where Mr. Hahn planned to locate his district office. The design engineering functions previously supervised by Mr. Wallace remained in Santa Fe, Las Cruces, Farmington and Roswell, New Mexico.

Carlos G. Martinez, who had been working for Ms. Hahn as a level 1–1 manager in pair gain planning prior to the engineering restructure, was downgraded to a level 1–2 position in Santa Fe and assumed the pair gain design engineering responsibilities which plaintiff would have assumed had he chosen to remain in the employ of Mountain Bell.

In 1983, following the engineering restructure, the following individuals were responsible for pair gain planning and pair gain design engineering for the two NDS engineering district:

**Engineering and Assignment—Outstate District**
**Pair Gain Planning:**

| | Location | Level | Date of Birth |
| --- | --- | --- | --- |
| Dan T. Creel | Albuquerque | 1–2 | 8/15/34 |
| Gabriel J. Rodriguez | Albuquerque | 1–2 | 2/24/38 |

**Pair Gain Design Engineering:**

| | Location | Level | Date of Birth |
| --- | --- | --- | --- |
| Carlos G. Martinez | Santa Fe | 1–2 | 6/19/43 |
| Manuel G. Garcia | Las Cruces | 1–2 | 5/26/41 |
| Thomas Shinas | Farmington | 1–2 | 10/18/45 |

**Engineering and Assignment—Metro District**
**Pair Gain Planning:**

| | Location | Level | Date of Birth |
| --- | --- | --- | --- |
| Frederick R. Wingfield | Albuquerque | 1–1 | 8/3/46 |
| Jaime Villegas | Albuquerque | 1–2 | 4/7/57 |

**Pair Gain Design Engineering:**

| | Location | Level | Date of Birth |
| --- | --- | --- | --- |
| Gary L. Cullen | Albuquerque | 1–2 | 11/11/37 |
| Wilmer Riecke | Albuquerque | 1–2 | 12/4/40 |

In March 1983, Drake was asked to return to work in the Network Switched Services Department on a contract basis. Drake states that upon returning to his former Albuquerque office, he observed three persons performing his former pair gain planning job functions:

| | |
| --- | --- |
| Dan T. Creel | age about 48 |
| Fred R. Wingfield | age about 37 |
| Gabriel J. Rodriguez | age about 44 |

Based on these observations, and the manner in which his employment ended, Drake filed the age discrimination charge with the Albuquerque District EEOC office.

Plaintiff receives a monthly pension check from Mountain Bell in the amount of $1,032.29 and received $18,000 in SIPP benefits paid out over four years following his retirement. In addition, following his retirement, plaintiff was re-employed by Mountain Bell through Manpower, Inc. on a temporary basis during the period March 28, 1983 through February 27, 1984 and received approximately $19,800 for this work.

## PRIMA FACIE CASE OF AGE DISCRIMINATION

Drake alleges in his second amended complaint that:

106. In effecting a reduction in work force in anticipation of the economic ef-

fects of the Divestiture Order, Defendants willfully and unlawfully targeted employees in the protected age group and discriminated against plaintiffs and members of the Section 216(b) Class with respect to their terms, conditions and privileges of employment because of plaintiffs' age, including designating plaintiffs and members of the Section 216(b) class as surplus or AFR [available for reassignment], and/or using the availability of early retirement plans in order to induce members of the Section 216(b) Class to terminate their employment.

107. Upon information and belief, Mountain Bell has recruited and/or promoted a cadre of younger Management employees not in the protected age group to perform the same duties as Plaintiffs and members of the Section 216(b) Class in implementing its discriminatory practices directed at Plaintiffs.

\* \* \* \* \* \*

109. Mountain Bell's willful use of age as a criterion in implementing its reduction in force during divestiture and reorganization evidences a pattern and practice of age discrimination in violation of the ADEA.

■ To establish a prima facie case of age discrimination, a plaintiff must show that he is within the protected age group, that he was doing satisfactory work, that he was discharged despite the adequacy of his work, and that his position was filled by a younger person. *Cockrell v. Boise Cascade Corp.*, 781 F.2d 173, 177 (10th Cir. 1986). Mountain Bell admits that Drake was within the protected age group during 1982 and that he was performing satisfactory work at the time of his retirement. Mountain Bell asserts that it is entitled to summary judgment because Drake has failed to establish that he was discharged despite the adequacy of his work, and that his position was filled by a younger person.

■ Drake asserts that the facts establish that he was constructively discharged since he had no real choice but to retire early given the alternative of a demotion and transfer of job location. In *Irving v.*

*Dubuque Packing Co.*, 689 F.2d 170, 172 (10th Cir.1982), the Tenth Circuit Court of Appeals stated that a "constructive discharge occurs when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit." The court explained in *Cockrell v. Boise Cascade Corp.*, 781 F.2d at 177 that "The test is whether a reasonable man would view the working conditions as intolerable and would feel compelled to resign." In *Cockrell*, the court considered constructive discharge in the context of a perceived demotion or reassignment. The plaintiff, a regional manager of several lumberyards, was asked to accept reassignment to manage one lumberyard. When he told management that he was not interested in running one lumberyard again, the plaintiff's supervisor gave the plaintiff only the choice of running the lumberyard or resigning. The supervisor testified that the company did not intend to reduce plaintiff's salary and stated that managing the lumberyard was not a demotion under the company's reorganization plan. The plaintiff testified that nothing was said about salary, nor had he been informed of the company's elevated role for yard managers. The *Cockrell* court held that the plaintiff adduced sufficient evidence of intolerable working conditions to warrant submitting the issue of constructive discharge to the jury.

Based upon the facts recited above and all the fair inferences therefrom, a jury could find that Drake was constructively discharged. Drake told Wallace at the November 22, 1982 meeting that he did not want to relocate. Yet, like the plaintiff in *Cockrell*, Drake was given only the choice of relocating and accepting a demotion or retiring with SIPP benefits. The facts surrounding Drake's retirement are even more compelling than those involved in *Cockrell* because Mountain Bell admits Drake's new job was a demotion. Drake was also pressured to make a decision quickly, without time for discussing his options with others. Drake may have concluded that the job in Santa Fe would be intolerable, especially

since his supervisor, Wallace, told him that he would be a fool not to accept retirement and the SIPP benefits.

The defendant cites two Seventh Circuit Court of Appeals decisions involving early retirement in support of its contention that Drake was not constructively discharged. In *Henn v. National Geographic Society*, 819 F.2d 824 (7th Cir.1987), the court affirmed the trial court's decision granting the defendant's motion for summary judgment on the ground that the plaintiffs had failed to establish that they were constructively discharged. The plaintiffs asserted that they were constructively discharged because their decision to take early retirement was involuntary in light of management's real and implied threats of unpleasant consequences if the plaintiffs did not increase their sales. The court concluded that pressure to sell more ads did not amount to making the plaintiffs' jobs intolerable: "Selling is a risky profession, and it does not make a salesman's job unbearable to remind him that he must produce and that there are penalties for failure." *Id.* at 830. The court further explained that "The reasonable inferences from this record would not allow a jury to infer that the plaintiffs would have been fired (in violation of the ADEA) had they turned down the offer of early retirement, and without such a constructive discharge they cannot undo their choice to retire." *Id.* In *Bartman v. Allis–Chalmers Corp.*, 799 F.2d 311 (7th Cir.1986), employees of the defendant retired early to take advantage of their pension benefits which were uncertain in light of the fast approaching expiration of their collective bargaining agreement. The trial court granted defendant's motion for summary judgment on the ground that the plaintiffs failed to establish that their early retirements amounted to constructive discharge. In affirming, the Seventh Circuit Court of Appeals explained that the condition that made the plaintiffs' situation apparently intolerable was not any action of the defendant, but rather expiration of the pension plan, an event brought about by the failure of the contract negotiations and the passage of time.

In both of these cases cited by Mountain Bell, the plaintiffs were not required to elect between reassignment and retirement —they had the option of continuing their same work. Drake, however, was forced to choose between retirement on the one hand and transfer and demotion on the other. The offer made to Drake was not beneficial. Only "When one option makes the recipient better off, and the other is the status quo" can the offer be considered beneficial. *Henn*, 819 F.2d at 826. Hence, the facts support an inference that Drake was discharged.

Mountain Bell also asserts that Drake has failed to establish a prima facie case because Drake was not replaced by a younger employee. Courts have recognized that the four-part test established for evaluating whether a plaintiff has established a prima facie of age discrimination must be adapted to the facts of each case. See, *Douglas v. Anderson*, 656 F.2d 528, 532 (9th Cir.1981), see also, *Schwager v. Sun Oil Company*, 591 F.2d 58, 61 fn. 1 (10th Cir.1979) (in applying the prima facie case standards "it is emphasized that they are merely guidelines and not inflexible, rigid approaches to determine whether a prima facie case has been established"). In *Douglas*, the Ninth Circuit Court of Appeals explained that the purpose for the test is to determine whether the evidence is sufficient to support an inference of discrimination. With respect to the replacement by a younger employee element, the court stated: "If the replacement is only slightly younger than the plaintiff, then it is less likely that an inference of discrimination can be drawn. However, replacement by an even older employee will not necessarily foreclose prima facie proof if other direct or circumstantial evidence supports an inference of discrimination." *Id.* at 533. For example, in reduction-in-force cases, it would not make sense to require a plaintiff to show that he was replaced by a younger employee. Other facts could support a finding that age was a determining factor in the employment decision.

Drake's job functions have been assumed by four people: Dan Creel, age 48 when Drake retired, was responsible for pair

gain planning in the southern part of New Mexico; Daniel Rodriguez age 44 when Drake retired, was assigned to to pair gain planning in the northern areas in New Mexico; Frederick Wingfield, age 36 when Drake retired, was assigned to pair gain planning in the metro group; Jaime Villegas, age 25 when Drake retired, was also in pair gain planning in the metro group. The job Drake was offered in Santa Fe was performed by Carlos G. Martinez, who was 39 years old when Drake retired. At least insofar as Drake was "replaced", these facts can create an inference that Drake was replaced by a younger employee. And even though these facts may not satisfy the fourth element in a strict sense, Drake has presented facts which can support an inference of age discrimination. *Douglas,* 656 F.2d at 533; *see also, Spagnuolo v. Whirlpool Corp.,* 641 F.2d 1109 (4th Cir.), *cert. denied,* 454 U.S. 860, 102 S.Ct. 316, 70 L.Ed.2d 158 (1981). For example, Roch made a comment to Drake that "all you old guys are alike", Wallace told Drake that he would be a fool not to retire with the SIPP benefits and Drake's retirement date was changed without any forewarning. This court agrees with the defendant that establishing an early retirement incentive program does not necessarily give rise to an inference of discriminatory intent on the part of Mountain Bell. Such a program may be beneficial. *See, Henn,* 819 F.2d at 826. However, when Drake was offered that program his only other option was to accept a downgraded position in a different location. The use of an early retirement program in this manner may support an inference of discriminatory intent. Drake has thus presented enough evidence to establish the existence of a prima facie case of age discrimination.

## MOUNTAIN BELL'S REASONS FOR ITS EMPLOYMENT DECISIONS

■ Once the plaintiff has established a prima facie case of age discrimination, the burden of going forward shifts to the defendant-employer to show that the employment decision was based on reasonable factors other than age. *See, Schwager v. Sun Oil Company,* 591 F.2d 58 (10th Cir. 1979) (adopting the approach used in Title VII cases to cases brought under the ADEA). Upon such a showing, the plaintiff has the ultimate burden of showing that the defendant's proferred justification is merely pretextual.

■ Mountain Bell asserts that its employment decisions were based upon the need to reorganize various departments, and that plaintiff's age had nothing to do with these business decisions. In support of its contention, Mountain Bell submitted affidavits from a number of employees responsible for the decision to relocate Drake. Neel Roch, the Staff Manager of Network Distribution Services department in New Mexico, states in his affidavit that "During the fall of 1982, there was a significant restructing or reorganization in New Mexico of the engineering groups within NDS, aimed at reducing operating costs and increasing efficiency." Roch Affidavit, ¶ 6. Roy Stage, the director of NDS in New Mexico, stated with respect to the reorganization of the NDS department that "This reorganization of Network Distribution Services was part of an on-going effort to size the management force to meet the requirements of changing business conditions." Stage Affidavit, ¶ 3. Stage also stated that "In addition to the company-wide reorganization of NDS which became effective in approximately January 1983, there was also a major reorganization of the engineering functions within NDS in New Mexico during December 1982. The purpose of the NDS engineering restructure was to increase efficiency and lower operating costs." *Id.* at ¶ 6. Furthermore, Stage explained that:

The changes brought about by the engineering restructure were intended to increase managers' responsibilities, accountability and spans of control, increase efficiency and create more challenging assignments for employees. The realignment of engineering personnel coincident with the 1982 engineering restructure included the downgrading of some management employees to lower levels of management and the promotion of some non-management personnel into level "1–2" management positions. The

decisions to promote or downgrade individual management and non-management employees were based upon the needs of the company and were made without regard to the ages of such employees.

*Id.* at ¶ 7.

Ms. Kim Mauldin Hahn explained the reorganization of NDS and consequently the decision to move Drake to Santa Fe as follows:

During the fall of 1982, there was a reorganization of the engineering groups within NDS in New Mexico. All of the engineering planning functions within Bill Wallace's "north" district were then based in Santa Fe. Bill Wallace and I determined that the north planning group should remain in Santa Fe and that Harry Drake's pair gain functions should be moved to Santa Fe. Bill Wallace and I intended that a portion of Mr. Drake's responsibilities would be assigned to Carlos G. Martinez, a first level (level 1–1) manager under my supervision who was then involved in pair gain planning. The remaining poriton of Mr. Drake's functions would be performed by Mr. Drake in Santa Fe as a level 1–2 manager in pair gain design engineering. As part of the engineering reorganization, both Carlos Martinez and Harry Drake were to be downgraded within the first level of management from level 1–1 to level 1–2 positions. The decision to move Mr. Drake's job functions to Santa Fe and downgrade his position to a level 1–2 job was based solely upon the business needs of the company at the time of the engineering restructure. Mr. Drake's age was not considered when the decision was made by Bill Wallace and me to move his job functions to Santa Fe.

Mauldin Hahn Affidavit, ¶ 5.

While these affidavits provide strong support for a finding of legitimate non-discriminatory reasons for these employer actions, they do not overcome the possible inference of pretext arising from the same evidence which supports Drake's prima facie case.

## CONCLUSION

The plaintiff's affidavit and other materials submitted in opposition to the defendant's motion for summary judgment have been found to be sufficient to prevent dismissal under Rule 56. Stated succinctly, if the plaintiff testifies to what is contained in his affidavit, it is possible that a jury could find from that testimony that Harry Drake was constructively discharged on November 22, 1982, and that the defendant constructed an elaborate pretext of reassigning job functions and personnel to cover up its decision to force him out of the company, pursuant to SIPP, because of his age.

It is clear that to find for Drake the jury would be relying largely on his testimony and the inferences to be drawn from it, together with some circumstantial evidence, to make the necessary findings and that such evidence is very specific as to Harry C. Drake.

When this court granted the motion for class action determination on the second amended complaint in the memorandum opinion and order which now appears as *Walker v. Mountain States Telephone and Telegraph Company*, 112 F.R.D. 44 (D.Colo.1986), there was reliance on the representations of plaintiff's counsel that Mr. Drake's case was sufficiently representative of the other first level managers who took SIPP that they could be considered "similarly situated" within the meaning of 29 U.S.C. § 216(b) and thus class treatment would be appropriate. The expectation was that there would be a showing of company wide action of advising such managers that they were declared surplus, offering of positions that were a "considerable downgrade" and replacement with younger employees. That is what was pleaded in the second amended complaint. What is now apparent is that Harry Drake was treated on a very individual basis. There is nothing in the record submitted in connection with this summary judgment motion to show that there was any general declaration of first level managers as surplus or even that Harry Drake

was declared surplus before his meeting with Wallace on November 22, 1982.

While all the requirements of Rule 23(a) are not applicable to this class determination, there must at least be such common questions of fact that the case is triable for all the claims presented by those who have opted in. That does not appear to be the case here. Accordingly, while the motion for summary judgment must be denied, the court must question the viability of proceeding as a class action. Therefore, it is

ORDERED, that the defendant's motion for summary judgment is denied, and it is

FURTHER ORDERED, that the plaintiff will on or before April 8, 1988, show cause in writing why the order to proceed under 29 U.S.C. § 216(b) as a class action should not be vacated.