97 F.3d 1452
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Hugh C. QUINN, Plaintiff-Appellant,
v.
NEWSPAPER ASSOCIATION OF AMERICA, a corporation, Defendant-Appellee.
 No. 95-1653.
 United States Court of Appeals, Sixth Circuit.
 Sept. 10, 1996.
 
 Before: GUY, BATCHELDER, and DAUGHTREY, Circuit Judges.
 PER CURIAM.
 
 
 1
 Claiming a violation of Michigan law, plaintiff, Hugh C. Quinn, sued his employer for age discrimination in state court. The action was removed to federal court on diversity grounds. Quinn, who alleges he would have been fired if he had not accepted his employer's early retirement offer, claims that he was constructively discharged based on age. The district court granted summary judgment in favor of the defendant, Newspaper Association of America, on the basis that (1) defendant's age discrimination claim under Michigan's Elliott-Larsen Civil Rights Act, Mich.Comp.Laws Ann. § 37.2202 et seq. (West 1985 & Supp.1996), is preempted by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq., because it "relate[s] to" an ERISA plan, see id. at § 1144(a); and (2) even if plaintiff's claim under Michigan's anti-discrimination statute were not preempted, it would still fail because plaintiff failed to make a prima facie case of discrimination under that act. Our review of the record convinces us that summary judgment was appropriately granted and we affirm.
 
 I.
 
 2
 Plaintiff was born on November 6, 1929. In 1952, he received a journalism degree and pursued a career in that field as a reporter and an editor. In 1973, he accepted a position with defendant, then known as the Bureau of Advertising of the American Newspaper Publishing Association, Inc. The defendant association consists of member newspapers and is financed by membership dues. It assists members in selling classified space in their newspapers. Quinn was hired as an account executive for automotive marketing.
 
 
 3
 In January of 1981, he was promoted to vice president of automotive classified. In that position, he developed job training programs related to selling automotive classified advertising, oversaw and designed research studies, conducted training programs regarding technological developments, and published a newsletter entitled Auto/Cam Report. He also functioned as a liaison between car dealer associations, dealers, dealer advertising agencies, and various newspaper members.
 
 
 4
 In the early 1990s, as many newspapers across the country closed, defendant's membership declined, and the company experienced a serious economic downturn. In pursuing ways to reduce expenses, defendant focussed on labor costs, its single highest expenditure.
 
 
 5
 In October 1990, defendant's executive management team met, including the company's new president, Leonard Forman. Minutes of that meeting reflect in part:
 
 
 6
 [I]t was clearly pointed out that our group was in place to facilitate the changes coming at [defendant]--both attitudinally and culturally as well as operationally. Each of us volunteered for assignments to help move this forward.
 
 
 7
 Len [Forman] pointed out that [defendant] will no longer be a place for people in the final 1/3 of their career. We are to establish clear career paths setting up [defendant] as a jumping off point for the future--not one of 1/2 step [sic] early retirement. We are looking for a new level--underclassman if you will--of talented aggressive professionals who will be able to move up.
 
 
 8
 (App. at 449.) The minutes of this meeting were somehow leaked to the workforce at large and were the subject of concern and discussion.
 
 
 9
 In a deposition in this case, Forman testified that he contacted the drafter of the minutes and "corrected him verbally and explained that it was out of context." (App. at 604.) He further explained his remarks as follows:
 
 
 10
 The Bureau was under attack and we were on the verge of going out of business. Part of the complaint that our customers were--or our members had, was that we had a hiring philosophy historically of hiring professionals outside the newspaper business, coming from disciplines who had long years of experience, and the criticism was that those people did not understand the newspaper business. So in restructuring we indicated that in the future when we made hires we would try to get a balance of professionals who had long experience, less experience, and newspaper experience, so that we can have a place for people to come in and have a career path and who may then go back to the newspaper business representing this organization.
 
 
 11
 That was the context in which that first statement was made. Not that it would no longer be a place for the final third of their career, but as we adopt to a different hiring philosophy we would look to have a better balance between more experienced professionals coming from things like real estate and retail, and less experienced people from the newspaper business, who we could train.
 
 
 12
 (App. at 605-06.)
 
 
 13
 In March 1991, the company announced an early retirement incentive program to reduce the workforce. The plan was offered to employees who met the following criteria: (1) were hired before July 1, 1978, (2) would be at least 55 years of age by April 1, 1991, and (3) were earning an annual salary of less than $120,000 as of June 1, 1990. Employees had two months to decide whether to opt for the program. In exchange for early retirement, employees would receive enhanced retirement compensation and medical insurance coverage.[1] Seventeen older workers, including plaintiff, were eligible for participation.
 
 
 14
 Quinn received a letter from the company informing him of his eligibility. In a meeting with the company's vice president of finance, Len Spinoso, Quinn informed Spinoso that he did not want to accept the offer. He objected to the terms, and indicated he was not old enough to receive Social Security benefits.
 
 
 15
 Later, Quinn's immediate supervisor, Eric Anderson, called Quinn and told him that President Forman had told Anderson to urge Quinn to accept the offer and go. Anderson further indicated that he did not know what would happen to Quinn if Quinn did not accept the offer. Nevertheless, Quinn told Anderson he did not intend to accept. In a separate conversation, Quinn's supervisor, Anderson, also told another employee, William Tausch, that Forman was pressuring him to get Quinn to accept the offer.
 
 
 16
 In the meantime, cuts in the company began to affect some of Quinn's job duties. In April, Forman cancelled the Dandy Awards, awards normally presented by Quinn to outstanding members. Quinn noticed other small changes. In March, Anderson told Quinn to begin publishing the Auto/Cam Report under Anderson's name rather than Quinn's. In April, Quinn was not requested to submit project goals for the new fiscal year beginning June 1, even though his colleagues were requested to do so. Quinn also had noticed that he was not given any performance evaluation. Anderson explained at his deposition that he had held off giving Quinn his performance evaluation for June 1990-May 1991 since he assumed Quinn would be accepting the early retirement package.
 
 
 17
 Quinn tried to negotiate additional compensation benefits for himself. President Forman told Quinn that no special deal would be negotiated. He added that after May 31 there would be enormous cuts, and the people let go would not receive nearly what was being offered in the early retirement incentive program.
 
 
 18
 Quinn then spoke with Spinoso, who was administering the program. Spinoso told Quinn that the company had a financial goal of getting seven of the seventeen people to accept the offer, and that Quinn was one of the seven.
 
 
 19
 At the same time Quinn sought assurances from his employer, he sought advice regarding the early retirement offer from a number of experts, including an attorney, an accountant, and a financial advisor. He also consulted his family and friends. Shortly before the offer was to expire, Quinn submitted an election form accepting the retirement package. In signing, however, he crossed out the words "voluntary early retirement" from the form. (App. at 130.) Quinn received an enhanced retirement sum of $43,000 plus medical insurance coverage in exchange for early retirement.
 
 
 20
 Within one year after accepting the offer, Quinn learned that a younger employee, Robert Scaife, had taken over some of Quinn's duties. By early 1994, Scaife took charge of automotive classified advertising.
 
 II.
 
 21
 We review de novo a district court's grant of summary judgment. McKee v. Cutter Labs., Inc., 866 F.2d 219, 220 (6th Cir.1989). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Furthermore, an adverse party may not rest upon the mere allegations of its pleading, but must respond by setting forth specific facts showing that there is a genuine issue for trial. A fact is "material" when it is capable of affecting the outcome of the suit under governing law; a dispute about "material fact" is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
 
 
 22
 In establishing a claim of intentional discrimination, plaintiff has the initial burden of proving a prima facie case. Under that burden, plaintiff must demonstrate facts, by a preponderance of the evidence, which if not explained, prove or give rise to an inference of unlawful discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).
 
 
 23
 In demonstrating a prima facie case of discharge based on age, generally a plaintiff must show that (1) the employee belongs to a protected group; (2) the employee was qualified for the position; (3) despite the employee's qualifications, he was discharged; and (4) the position was filled by a younger person of comparable (or lesser) qualifications. See id.; Matras v. Amoco Oil Co., 385 N.W.2d 586, 589 (Mich.1986).[2]
 
 
 24
 There is no dispute that Quinn satisfies the first two requirements of this test. The district court found, however, that Quinn failed to satisfy the third requirement, i.e., he was discharged.[3]
 
 
 25
 In response to the obvious fact that Quinn elected to retire under defendant's early retirement program, Quinn relies on the defense of constructive discharge. Constructive discharge can be shown in the context of an early retirement program when a plaintiff shows that he would have been fired in violation of the age discrimination laws had he turned down the offer of early retirement. See Henn v. National Geographic Soc'y, 819 F.2d 824, 830 (7th Cir.), cert. denied, 484 U.S. 964 (1987).
 
 
 26
 Taking the evidence presented in the light most favorable to Quinn, we conclude that no genuine issues exist as to any material fact that would support a finding he was involuntarily discharged. The voluntary nature of the program is abundantly evident. Quinn was given two months to decide whether to accept the offer. He was encouraged to seek professional advice, and in fact did seek such advice. The program documents and announcement made clear that it was offered on a strictly voluntary basis. Defendant never told Quinn that he could not continue to work if he turned down the offer. Indeed his automotive classified duties were not eliminated. Robert Scaife assumed some of these duties shortly after Quinn elected to retire early and ultimately took charge of that area of classified advertising.
 
 
 27
 Plaintiff's constructive discharge claim in essence is founded upon his view that under the circumstances choosing early retirement was the better alternative to remaining employed because he believed there was a risk associated with remaining at the company. The fact that plaintiff's choice to retire may have been difficult, however, does not render it involuntary. See id. at 829. As the Henn court indicated, "an employer's communication of the risks of the job does not spoil the employee's decision to avoid those risks by quitting." Id. at 830. While defendant could not guarantee Quinn a long and prosperous career at the company, in no way do the facts support that it would have fired Quinn had he elected not to retire.
 
 
 28
 Since we have concluded that plaintiff failed to produce evidence that would support a claim upon which relief could be granted, we find it unnecessary to reach the issue of ERISA preemption.[4]
 
 
 29
 AFFIRMED.
 
 
 
 [1]
 The employees were not asked to sign any waiver or release of potential claims against the employer in connection with the program
 
 
 [2]
 Although plaintiff brings this claim under Michigan's Elliott-Larsen Civil Rights Act, cases construing the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq., are instructive. Simpson v. Midland-Ross Corp., 823 F.2d 937, 940 (6th Cir.1987) ("for analytical purposes, Michigan's Elliott-Larsen Act resembles federal law, and the same evidentiary burdens prevail as in ADEA cases")
 
 
 [3]
 The district court further found that plaintiff failed to satisfy the fourth requirement, replacement by a younger worker. In the context of a reduction in force, as occurred in this case, however, an employee need not show that he was replaced by a younger person, but must show that age was a determining factor in his termination. LaGrant v. Gulf & Western Mfg. Co., 748 F.2d 1087, 1091 (6th Cir.1984); Matras, 385 N.W.2d at 590. We need not address this issue, however, as we affirm on the no discharge issue
 
 
 [4]
 The district court's opinion also suggests that Quinn had to tender back the retirement benefits before suing his employer. This conclusion appears to conflict with Michigan law. If an employee leaving a job releases his employer from liability in exchange for consideration, he must tender back the consideration before suing the employer. E.g., Leahan v. Stroh Brewery Co., 359 N.W.2d 524, 525 (Mich.1984). That requirement is irrelevant in this case, however, since no release was involved. As one Michigan court has explained:
 Since there was no provision in the [severance] document releasing defendants from a potential lawsuit, there was no requirement that plaintiff tender back the severance pay before filing a lawsuit. Defendants do not contend that the money was paid in exchange for an agreement that plaintiff not sue. Therefore, defendants remain in the position they were in prior to the signing of the document. Furthermore, plaintiff is not bringing an action in contravention of the document; he never agreed not to sue.
 Hammond v. United of Oakland, Inc., 483 N.W.2d 652, 654 (Mich.Ct.App.1992) (citation omitted).