96 P.3d 220

The STATE of Arizona ex rel. Terry GODDARD, the Attorney General, and The Civil Rights Division of the Arizona Department of Law, Plaintiff–Appellant/Cross Appellee,

v.

PHOENIX UNION HIGH SCHOOL DISTRICT NO. 210, Defendant–Appellee/Cross Appellant.

No. 1 CA–CV 03–0518.

Court of Appeals of Arizona, Division 1, Department D.

Aug. 19, 2004.

OPINION

EHRLICH, Judge.

¶ 1 Three teachers who had retired from the Phoenix Union High School District ("District") filed complaints of age discrimination by the District with the Arizona Civil Rights Division of the Arizona Department of Law ("State"). Two of the teachers had opted to take early retirement before age sixty-five, and one teacher had retired after age sixty-five. The State determined that there was reasonable cause and filed suit against the District pursuant to the Arizona Civil Rights Act ("ACRA"), Arizona Revised Statutes ("A.R.S.") § 41–1401 *et seq.*, alleging that the District had discriminated against a class of older employees and denied those employees equal employment opportunities. It sought injunctive relief and damages for the three named teachers and "a class of employees who were paid a lower daily rate to substitute teach because of their age."

¶ 2 The case was tried by the Maricopa County Superior Court, which found that the District's retirement plans were discriminatory and not within any statutory exception. It awarded back pay to the members of the class identified by the State, and it enjoined the District from "continuing to discriminate in compensation."

¶ 3 The State appealed from the superior court's calculation of the back pay and from the court's failure to award back pay to other members of the class. The District cross-appealed from the court's finding that the District's retirement plans were discriminatory. For reasons that follow, we reverse the finding that the plans constituted unlawful age discrimination and therefore vacate the injunction and the awards of back pay.

¶ 4 The District in 1976 adopted a voluntary Early Retirement Program ("ERP") as a result of negotiations with its teachers. It has been available every school year since then. To enroll in the 1997–1998 school year, a teacher had to have ten consecutive years of service, be at least fifty years of age [1] and "opt[ ] to take retirement prior to age 65." A teacher could participate for a period not

Terry Goddard, Attorney General, Phoenix, by Judy Drickey–Prohow, Assistant Attorney General, Tucson, Attorneys for Plaintiff–Appellant/Cross Appellee.

Littler Mendelson, by Charles L. Fine and Rebecca Burnside, Phoenix, Attorneys for Defendant–Appellee/Cross Appellant.

---

1. Age fifty, with five years total credited service, is the earliest age for retirement under the Arizona State Retirement System. *See* A.R.S. § 38–758 (2001).

to exceed his/her years of full-time service with the District, but participation was "involuntarily terminated" by the District once the participant reached age sixty-five. The District paid the participant's health, major medical and life insurance premiums, and, in exchange, the participant agreed to be a substitute teacher a minimum of one day (to avoid concerns about the state gift statute) and a maximum of forty days in a school year at a premium rate of $112.50 per day. If the teacher worked twenty-one or more consecutive days but not more than forty, the pay increased retroactively to a "super-premium" rate of $200 per day. If the teacher worked more than forty days in a year, however, the pay was reduced to the standard or "regular substitute rate."

¶ 5 From 1998–2000, the standard pay for substitute teachers was $60 per day unless the teacher taught twenty consecutive days in the same assignment, in which case the pay was retroactively increased to $75 per day. Beginning with the 2000–2001 school year, the standard rate was increased to $65 per day for the first sixty days, and $70 per day for sixty-one or more days, but the twenty-consecutive-day rate remained the same.

¶ 6 The District also offered on three occasions a separate and distinct Voluntary Incentive Plan ("VIP") to all employees with ten total years of service, whether or not the ten years of service were consecutive and whether or not the employee was then eligible to collect a full pension from the State Retirement System. The three opportunities were in 1995 ("VIP 1"), 1999 ("VIP 2"), and 2000 ("VIP 3," known as the Early Severance Plan or "ESP")[2] (collectively "VIP"). In exchange for ending his/her employment with the District, the participant would receive an annuity equal to his/her final annual salary payable in monthly installments over a period of either ten or eight years depending on the VIP. In return, the participant agreed to substitute teach for at least ten or eight days in each year that (s)he received the annuity.

¶ 7 All teachers in the VIP, regardless of age, received the standard substitute pay in addition to the annuity, giving each VIP participant far more as a result than the ERP premium pay for substitute teaching. Additionally, if a person who had ten consecutive years of service enrolled in a VIP between age fifty and age sixty-five, the District automatically covered that person under the ERP unless (s)he chose not to participate in both plans. VIP participants who were younger than age fifty or older than age sixty-five or who did not have ten consecutive years of service were ineligible for the ERP, however, and therefore were paid the standard rate.

¶ 8 It was not uncommon for a person to participate in both the ERP and the VIP because the ERP paid for insurance and substitute teaching at a higher rate. Those who enrolled in both plans and who became age sixty-five during the annuity period were "involuntarily terminated" from the ERP by the District, but they continued in the VIP for the remainder of the ten- or eight-year term. They were paid the standard substitute rate upon commencement of the next school year after their birthdays.

¶ 9 Lori Dropney, the District's Assistant Superintendent for Business and Operations, testified that the VIP was "an incentive for employees to leave the District earlier than they might have originally planned to." VIP 1 was offered due to "severe budget problems" that would have required laying off approximately 350 employees had it not been successful. The plan was to "accrue budget savings" and allow employees to leave voluntarily rather than involuntarily. According to Dropney, offering the VIP was "primarily a financial decision."

¶ 10 Linda Goin, the District's Director of Human Resources when the VIPs were adopted, testified that VIP 1 had a tremendous impact. She added that, after it was put in effect, only a few people remained on the reduction-in-force list. The District then

---

**2.** The ESP was offered only to individuals who "felt that they would have taken the VIP II had it been known at the time that the state retirement system was going to change its calculations of benefits and include the VIP benefit in their retirement calculation." The ESP additionally required that a participant must "have entered an Arizona State Retirement System prior to January 1 of 1984."

offered VIP 2 after a study showed further significant financial benefits for the District as well as a shortage of substitute teachers.

¶ 11 The resolutions adopting VIPs 1 and 2 stated that, to minimize lay-offs and to maintain high educational standards, the VIP would "substantially increase voluntary retirements or resignations in a manner which rewards these higher paid staff members and reduces salary costs." The VIP also would create a pool of experienced substitute teachers.

¶ 12 The superior court focused on the point that VIP retirees over age sixty-five were paid less for required substitute teaching than VIP retirees under age sixty-five, although it recognized that the members of the latter group also were enrolled in the ERP, that the ERP was voluntary, and that its members knew or should have known that the ERP ended when the member became age sixty-five. It concluded that the District's plans offered different rates of pay based on age and participation in the plans and, therefore, the plans on their face violated A.R.S. § 41–1463(B)(1) and (2), applying the principles of *International Union v. Johnson Controls, Inc.,* 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). It concluded also that the plans were a hybrid of both pay and other employee benefits but that they were "not a subterfuge to evade the purposes of the statute." Nonetheless, the court found that, because the plans were a hybrid, they did not qualify for the "statutory safe harbor" of A.R.S. § 41–1463(G)(4) (2004),[3] which permits an employer to have a bona fide employee benefit plan if it is not a "subterfuge" to evade the purposes of the ACRA. Ultimately the court decided that, while "there were some nondiscriminatory reasons for adopting the plan, the plan [was] unlawful because of its discriminatory effects."

¶ 13 In its cross-appeal, the District challenges the superior court's finding that the plans are unlawfully discriminatory. It contends that the plans are the sort of employee-benefit plans permitted by A.R.S. § 41–1463(G)(4). Our disposition of the cross-appeal favorable to the District makes moot the consideration of the issues raised in the appeal.

¶ 14 The ACRA makes it unlawful for an employer to discriminate against any person with regard to "compensation, terms, conditions or privileges of employment" because of the individual's age, A.R.S. § 41–1463(B)(1), or to "limit, segregate or classify employees" so as to "deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect the individual's status as an employee" because of the person's age. A.R.S. § 41–1463(B)(2). It is not unlawful, though, for an employer either to differentiate among individuals if "based on reasonable factors other than age" or to provide a "bona fide employee benefit plan" as long as it is not for the purpose of evading the prohibition against age discrimination. A.R.S. § 41–1463(G)(4)(a), (b).[4] The statute does not define "bona fide employee benefit plan."

¶ 15 The ACRA provision addressing age discrimination was modeled after the original version of the federal Age Discrimination in Employment Act of 1967 ("ADEA"), Pub.L.

---

3. The parties and the court cited A.R.S. § 41–1463(F)(4). This section was amended in 2002 when a new subsection (F) was added and what had been subsection F(4) was designated subsection G(4). *See* 2002 Ariz. Sess. Laws Ch. 339, § 5. The language was not changed, however, and we will refer to the section by its current designation.

4. Section 41–1463(G), A.R.S., provides that:

G. Notwithstanding any other provision of this article, it is not an unlawful employment practice:

\* \* \*

4. With respect to age, for an employer, employment agency or labor organization:

(a) To take any action otherwise prohibited ... if the differentiation is based on reasonable factors other than age.

(b) To observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, deferred compensation or insurance plan, which is not a subterfuge to evade the purposes of the age discrimination provisions of this article, except that no employee benefit plan may excuse the failure to hire any individual and no seniority system or employee benefit plan may require or permit the involuntary retirement of any individual ... because of the individual's age.

No. 90–202, § 2, 81 Stat. 602 (codified as amended at 29 U.S.C. § 621 *et seq.* (1999 & Supp.2004)), to grant workplace protections in favor of employees between the ages of forty and sixty-five. ADEA, Pub.L. No. 90–202, § 12, 81 Stat. 607 (codified as amended at 29 U.S.C. § 631(a)). The ADEA provides in part that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate ... with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1).

¶ 16 The concern prompting the federal legislation had to do with individuals who were not being hired because of their age and with employees who were being forced out of their employment for the same reason. *See* ADEA, Pub.L. No. 90–202, 1967 U.S.C.C.A.N. 2213, 2214, 2220; *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610–13, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). *See generally Gen'l Dynamics Land Sys., Inc. v. Cline,* 540 U.S. 581, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004); Cathy Ventrell–Monsees, *"Take the Money and Run or It's Too Late Baby": Early Retirement Incentives and the Age Discrimination in Employment Act,* 1999 U. Memphis L.Rev. 783, 784–87, 790 n. 37. The ADEA did permit, however, a differential treatment of older employees in the context of a bona fide employee benefit plan if the plan was not a subterfuge to evade the purpose of the law. ADEA, Pub.L. No. 90–202, § 4, 81 Stat. 603 (codified as amended at 29 U.S.C. § 623(f)); *see Hazen Paper,* 507 U.S. at 610–11, 113 S.Ct. 1701 (discrimination on basis of factor merely correlated with age such as years of service not unlawful disparate treatment); *id.* at 613, 113 S.Ct. 1701 ("[p]ension status may be a proxy for age"); *Allen v. Diebold, Inc.,* 33 F.3d 674, 676 (6th Cir.1994) (noting that, in *Hazen Paper,* the Court clarified that the ADEA "does not constrain an employer who acts on the basis of ... factors ... that are empirically correlated with age" absent proof that the employer is using these factors as a proxy for age); *see, e.g., Chiaramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391 (7th

Cir.1997) (discussing ADEA in context of employment termination), *cert. denied,* 523 U.S. 1118, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998); *Snow v. Ridgeview Med. Ctr.,* 128 F.3d 1201, 1207–08 (8th Cir.1997) (same); *Jones v. Unisys Corp.,* 54 F.3d 624 (10th Cir.1995) (discussing ADEA in context of "reduction in force"). *See generally* Michael J. Van Sistine & Bruce Meredith, *The Legality of Early Retirement Incentive Plans: Can Quantum Physics Help Resolve the Current Uncertainty?,* 84 Marq. L.Rev. 587, 616 (2001).

¶ 17 Congress has amended the statutory scheme several times for varying purposes and to varying degrees. *See generally Cline,* 124 S.Ct. at 1244–45 n. 4. For example, in 1986, it eliminated the upper age limit on the ADEA's protections. ADEA, Pub.L. No. 99–592, § 2(c)(1), 100 Stat. 3342 (codified as amended at 29 U.S.C. § 631(a)). At least two commentators have suggested that this change effectively eliminated notions of a conventional or accepted endpoint to employment and prompted the widespread adoption of early retirement incentive plans ("ERIPs") to accelerate the retirement of those nearing what was regarded as the usual retirement age. Samuel Issacharoff & Erica Worth Harris, *Is Age Discrimination Really Age Discrimination?: The ADEA's Unnatural Solution,* 72 N.Y.U. L.Rev. 780, 814–15 (1997). Indeed, four years later, Congress adopted the Older Workers Benefit Protection Act ("OWBPA") authorizing ERIPs if they were voluntary and consistent with the ADEA's purposes.[5] OWBPA, Pub.L. No. 101–433, 104 Stat. 978 (codified as amended at 29 U.S.C. §§ 623, 626, 630); *see also* OWBPA, Pub.L. No. 101–433, 1990 U.S.C.C.A.N. 1509, 1523 (noting that "the Committee has purposefully eliminated the word 'subterfuge' from the new section").

¶ 18 The United States Supreme Court has not addressed age-based differentiations in ERIPs, but, as the ADEA has evolved, the lower federal courts have considered myriad variations in both employee benefit plans and ERIPs. Many of them have wrestled with

---

5. Congress passed the OWBPA, amending portions of the ADEA, in response to the Supreme Court opinion in *Public Employees Retirement System of Ohio v. Betts,* 488 U.S. 907, 109 S.Ct. 256, 102 L.Ed.2d 245 (1988). *See* 29 U.S.C. § 621 (statutory note).

whether ERIPs that reduce or deny benefits based on age are illegal, and, although the ACRA has not undergone the same evolution as the ADEA, these decisions are helpful. *See Civil Rights Div. v. Amphitheater Unified Sch. Dist. No. 10,* 140 Ariz. 83, 85, 680 P.2d 517, 519 (App.1983) (federal cases interpreting federal law may be considered when Arizona precedent lacking with regard to Arizona law premised on federal statutes).

¶ 19 In one of the first reported ADEA cases involving early retirement plans, the United States Court of Appeals for the Eighth Circuit considered an ERIP designed to provide an incentive for teachers to retire at an earlier age by offering $10,000 to those teachers eligible for normal retirement at age fifty-five but reducing the incentive by $500 a year between ages fifty-five and sixty and by $1500 for each year over age sixty. *Patterson v. Indep. Sch. Dist. # 709,* 742 F.2d 465, 467–68 (8th Cir.1984). The completely voluntary plan was upheld as a bona fide employee benefit plan and not an unlawful subterfuge, *id.* at 468–69, the court noting that "all retirement plans necessarily make distinctions based on age." *Id.* at 467 (quoting *United Air Lines, Inc. v. McMann,* 434 U.S. 192, 207, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977)).

> Obviously a man of 67 can not retire at age 55 and obtain benefits provided for persons of that age. And to effect the purpose of encouraging early retirement, the sliding scale of diminishing benefits is manifestly appropriate.

*Id.* at 468–69. The fact that some teachers were too old to enroll did not render the plan illegal. *Id.*

¶ 20 The *Patterson* analysis was followed in *Britt v. E.I. DuPont de Nemours & Co., Inc.,* 768 F.2d 593, 595 n. 4 (4th Cir.1985), in which the court referred to "the sliding scale of diminishing benefits." It also observed that a voluntary reduction in force, "instead of representing discrimination on the basis of age, simply reflected the reality that the younger worker deserved more wage-substitute pay than an older worker closer to retirement age." *Id.*

¶ 21 Some teachers who retired after age sixty challenged an ERIP available to those between ages fifty-five and sixty with twenty years of service in *Cipriano v. Bd. of Educ. of City Sch. Dist. of North Tonawanda,* 785 F.2d 51, 52 (2d Cir.1986). The court reversed summary judgment for the employer and held that, in the case of early retirement plans, the employer "must come up with some evidence that the plan is not a subterfuge to evade the purposes of the ADEA by showing a legitimate business reason for structuring the plan as it did." *Id.* at 58. Although, it would not "go so far as practically to read the subterfuge clause out of the statute," the court questioned whether the plan could be a subterfuge given that it was voluntary and related to years of service, and that the challengers were only objecting to their exclusion from it. *Id.* The court found it "only reasonable for the employer to offer more to those employees who choose to leave at a younger age, saving the employer more years of continued full salary, than to those who remain in the workforce and do not confer on the employer the sought-after benefit." *Id.* at 54–55. Nonetheless, observing that the plan was not as carefully tailored as the plan in *Patterson,* it remanded the case for consideration whether the plan was a subterfuge. *Id.* at 59.

¶ 22 In *Dorsch v. L.B. Foster Co.,* 782 F.2d 1421, 1423 (7th Cir.1986), an employer offered those employees whose age and years of service totaled seventy-five a flat payment of $600 per month until age sixty-two. The court found that this ERIP served one of the purposes of the ADEA and was lawful. *Id.* at 1429. *But see Solon v. Gary Comm. Sch. Corp.,* 180 F.3d 844, 854 (7th Cir.1999) (finding the holding of *Dorsch* limited by the OWBPA). Although younger workers could enjoy the benefit longer, all eligible employees who met the age and service requirements could receive an equal monthly benefit and older workers were selected for the benefit. *Dorsch,* 782 F.2d at 1429.

¶ 23 Soon after *Dorsch,* salesmen who had opted into an ERIP available to all employees older than age fifty-five challenged the plan of another company that also was facing a decline in business. *Henn v. Nat'l Geographic Soc'y,* 819 F.2d 824, 826 (7th Cir.), *cert. denied,* 484 U.S. 964, 108 S.Ct. 454, 98

L.Ed.2d 394 (1987). The court held that "[a]ny early retirement program reduces average age, because only older employees are eligible to retire. That the Society favored the results of its program [did] not condemn the program." *Id.* at 830. It declined to presume that voluntary ERIPs were discriminatory. *Id.*

> Retirement is not itself a prima facie case of age discrimination ... [a]nd ... an offer of incentives to retire early is a benefit to the recipient, not a sign of discrimination. Taken together, these two events—one neutral, one beneficial to the older employee—do not support an inference of age discrimination.

*Id.; see also id.* at 827 (noting that courts have "treated offers of early retirement benefits in the way we have found natural—as favors to the older employees, about which they cannot complain") (citing *Gray v. New England Tel. & Tel. Co.*, 792 F.2d 251, 255 (1st Cir.1986), *Coburn v. Pan Am. World Airways*, 711 F.2d 339 (D.C.Cir.1983), and *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66 (6th Cir.1982)).

¶ 24 The *Henn* case in turn was cited with approval in *Bodnar v. Synpol, Inc.*, 843 F.2d 190, 192–93 (5th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988), for the proposition that voluntary ERIPs can be a benefit for older employees.

¶ 25 While still recognizing ERIPs as a boon to employees, shortly after its decisions in *Dorsch* and *Henn*, the Seventh Circuit in *Karlen v. City Colleges of Chicago*, 837 F.2d 314 (7th Cir.), *cert. denied sub nom. Cook Co. College Local 1600 v. City Colleges of Chicago*, 486 U.S. 1044, 108 S.Ct. 2038, 100 L.Ed.2d 622 (1988), took a more critical view at the summary-judgment stage of an early retirement plan adopted to save money, bring in "new blood" and make room for women and minority faculty. *Id.* at 316. The circumstances of the Chicago City Colleges indicated, though, that its incentive plan may have been a substitution forced by law for an involuntary plan that displayed the employer's age animus. All teachers be-

tween ages fifty-five and sixty-nine were eligible for the plan, but unused sick leave was paid as a percentage of base salary, and the percentage rose from ages fifty-five to sixty-four and declined from ages sixty-five to seventy. *Id.* Insurance also was paid for those who retired between ages fifty-five and sixty-four, until they reached the age of seventy, but not for those who retired at or after age sixty-five. *Id.* Unlike plans that had found approval by the court in *Dorsch* and *Henn*, this plan discriminated among those eligible for early retirement and disfavored older eligible workers relative to younger ones. *Id.* at 317–18.

¶ 26 The court accepted that good reasons might justify a reduction in benefits with age:

> the discrimination seems to be in favor of rather than against older employees, by giving them an additional option and one prized by many older employees. Nor can it seriously be argued that the concept of early retirement ... stigmatizes such workers.... Entitlement to early retirement is a valued perquisite of age—an additional option available only to the older worker and only slightly tarnished by the knowledge that sometimes employers offer it because they want to ease out older workers.

*Id.* at 317. It added that ERIPs often are consistent with the ADEA, *id.* at 317–18, but it held in this case that those reasons for enacting the ERIP were relevant to the defense that the plan was not a subterfuge rather than to the prima facie case of discrimination, *id.* at 318–19, and that a jury must decide whether this plan was a subterfuge to evade the ADEA. *Id.* at 319.[6]

¶ 27 The facts of *American Association of Retired Persons v. Farmers Group, Inc.*, 943 F.2d 996 (9th Cir.1991), *cert. denied*, 502 U.S. 1059, 112 S.Ct. 937, 117 L.Ed.2d 108 (1992), suggested a similar employer age animus. Farmers denied pension plan credits, profit sharing contributions and forfeiture allocations to employees sixty-five years of age and older, thereby in fact decreasing the compensation of those employees. *Id.* at 999. It

---

**6.** The reasoning of the courts in *Cipriano*, 785 F.2d 51, and *Karlen*, 837 F.2d 314, was not fully accepted in other cases or by other federal courts of appeal and was impliedly overruled in *Betts*, 488 U.S. 907, 109 S.Ct. 256.

also prohibited the distribution of account balances to that same group of older employees until their actual retirements. *Id.* The court of appeals affirmed the district court's conclusion "that the purpose of the plan provisions was to discourage people from working past the age of 65, and that each plan was a subterfuge to evade the purposes of the ADEA." *Id.* at 1000. In doing so, it noted that "Farmers offer[ed] no legitimate, non-discriminatory reason" for the design of its pension plan; "[r]ather the evidence supports a determination that, as a business policy, Farmers wanted to get rid of older workers." *Id.* at 1002. Although Farmers' profit-sharing plan was a "hybrid" in having aspects of immediate compensation and a retirement plan, the court considered it to be "part of an integrated retirement package," *id.* at 1003, and one made "as undesirable as possible for persons over age 65." *Id.* at 1004. Again the court found that Farmers had "failed to offer evidence of a legitimate, non-discriminatory reason for the challenged provisions" and that the district court had not erred "in concluding that they were a subterfuge to evade the purposes" of the ADEA. *Id.* at 1005.

¶ 28 In passing the OWBPA, Congress reiterated its purposes in passing the ADEA and sought to prohibit discrimination in the provision of employee benefits. It accordingly included in the OWBPA that the ADEA "encompasses all employee benefits." OWBPA, Pub.L. No. 101–433, 1990 U.S.C.C.A.N. 1509, 1544. It added that "action otherwise prohibited under the ADEA is not unlawful while the employer observes the terms of a bona fide seniority system not intended to evade the purposes of the Act," and also that "it shall not be unlawful to observe the terms of a bona fide voluntary early retirement incentive plan that furthers the purposes of this Act." *Id.* at 1545.

¶ 29 In one of the first cases decided after the passage of the OWBPA, a federal appellate court addressed an ERIP that in effect provided that younger retirees would receive a larger pension than older workers with the same amount of service who took the option. *Lyon v. Ohio Educ. Ass'n & Prof'l Staff Union*, 53 F.3d 135, 136–37 (6th Cir.1995).

The benefit was calculated by crediting the years that an employee could have worked until the retirement age of sixty-two, the "normal" retirement age, plus the employee's actual years of service multiplied by a percentage of average compensation. *Id.* The court found no prima facie case of disparate treatment, *id.* at 137, and no evidence of improper motive or intent to discriminate against older employees, *id.* at 139, because the plan used imputed years of service and not age to determine benefits. It noted that "the very purpose of offering an early retirement *incentive* plan is to 'buy out' expensive workers" and that ERIPs, particularly when negotiated in collective bargaining as a benefit, "enable employers and workers alike to avoid involuntary layoffs by accelerating the pension process." *Id.* It viewed the necessity of a larger benefit to buy out one who foregoes more years of working as an "actuarial reality" rather than an illegal practice. *Id.* at 140. Employees hired at an older age had less time to accumulate the needed years of service, and thus, while their retirement benefits were less than those who started work at an earlier age, it was not because of their age, but rather years of service. *Id.*

¶ 30 In another post-OWBPA case, the Seventh Circuit interpreted OWBPA to bar an ERIP that was available only to teachers with at least fifteen years of service and between ages fifty-eight and sixty-one and in which the incentive payments ended at sixty-two. *Solon*, 180 F.3d at 846–47. The plaintiffs had opted not to retire at age 58 and did not receive as many of the monthly payments as those who retired earlier. *Id.* at 847–48. The district court found that, on its face, the plan was discriminatory and that the schools had waived the OWBPA's affirmative defenses by failing to raise them. *Id.* at 848. The court also conceded that those who did not retire early suffered "no loss in position, salary, or other benefits" and "almost certainly earn[ed] more in salary and benefits by continuing to work than they have forfeited by declining to retire at age 58 to 61." *Id.* at 853. Ultimately though, because all incentives ended at age sixty-two, the court held that those who retired younger were treated more favorably than those who retired older

based solely on their age at retirement. *Id.* at 853–54.[7]

¶ 31 Also post-OWBPA, the Second Circuit addressed an ERIP that permitted teachers aged fifty-five with twenty years of service in the state retirement system and with ten consecutive years with the district, or those fifty-five or over when they obtained the service requirements to retire in return for $12,500 and a payment based upon accumulated sick leave. *Auerbach v. Bd. of Educ. of Harborfields Cent. Sch. Dist.,* 136 F.3d 104, 107–08 (2d Cir.1998). Those who met the requirements had to take the option in the year in which they qualified. *Id.* at 108. Some who opted not to take the plan argued that the fifty-five age limit was unlawful. *Id.* The court found that the plaintiffs had established their burden of proving a prima facie case because age, and not years of service, was "the trigger" for the denial of benefits and the disparate treatment of the teachers. *Id.* at 110. Still, it held, the plan was valid and consistent with the purposes of the ADEA. *Id.* at 113.

¶ 32 In evaluating whether the plan furthers the purposes of the ADEA, the court counseled that "an inquiry [should] be made on a case-by-case basis, taking into account all of the relevant facts and circumstances," and the reviewing court "should consider whether the plan (1) is truly voluntary, (2) is made available for a reasonable period of time, and (3) does not arbitrarily discriminate on the basis of age." *Id.* at 112–13. Upon so doing, the court held that "[t]he retirement plan in the case at hand is precisely the sort of early retirement incentive plan that Congress aimed to preserve as lawful when it passed the [OWBPA]," citing the OWBPA's legislative history suggesting that "time-related window[s]" during which employees are offered flat-dollar and service-based enticements in early retirement plans are valid. *Id.* at 113. The plan did not "arbitrarily discriminate on the basis of age among early

retirees who [chose] this option because it [did] not diminish benefits" as the plan participants aged. *Id.* at 114. All who qualified were treated equally regardless of their actual age at retirement. *Id.*

¶ 33 These federal cases illustrate age-based differentiations in employee benefits and specifically in retirement plans. Lacking Arizona precedent applying the ACRA to early retirement plans or incentives, we continue by employing the federal ADEA law as is applicable to the ACRA and the plans at issue.

■ ¶ 34 The superior court found that VIP retirees older than age sixty-five were paid less for required work than younger VIP retirees who also were enrolled in the ERP. Applying the reasoning of *Johnson Controls,* 499 U.S. 187, 111 S.Ct. 1196, it concluded that the District's plans on their face appeared to violate A.R.S. § 41–1463(B)(1) and (2) by offering different rates of pay based on age and participation in the plans, although the plans were voluntary and neither "a subterfuge to evade the purposes of the statute" nor adopted out of improper motives. In the end, the court decided that, because the plans were a hybrid of compensation and benefits, they did not fall within the statutory exception for bona fide retirement plans and, because of their discriminatory effects, the plans were unlawful.

¶ 35 The superior court's reliance on *Johnson Controls,* a gender-discrimination case, was not the appropriate choice. Comparing the histories of Title VII of the Civil Rights Act of 1964 and the ADEA passed three years later suggests that Congress viewed race and gender differently from age as protected personal categories. As the Court wrote in *Cline,* 124 S.Ct. at 1247, "the prohibition of age discrimination is readily read more narrowly than analogous provisions dealing with race and sex." The real differ-

---

7. No other federal court of appeals has accepted the *Solon* analysis perhaps because, as a practical economic matter, it would not be worth an employer's effort to offer an ERIP unless the plan induced the older and, therefore, more-expensive employees to leave their employment sooner than they would have left if there were no incentive provided. *See* Van Sistine & Meredith,

84 Marq. L.Rev. at 591–92. These two commentators believe that *Solon* was wrongly decided for that reason and others. *Id.* at 593–96. "[I]n the context of ERIPs, age distinctions are made to further voluntary plans that are motivated by legitimate economic and demographic factors and do not stigmatize politically vulnerable individuals." *Id.* at 595 (footnote omitted).

ence is that, while race and gender are immutable from birth, every person ages. Indeed, many state and federal benefits are premised on this distinction.

¶ 36 The State contends that, because the plans included compensation for work performed by the participants, the decrease in payments for such work once the participants reached age 65 must be separately analyzed from the retirement aspects of the plans and cannot be considered a fringe benefit for purposes of the exception for bona fide employee benefit plans, citing *Farmers,* 943 F.2d at 1003. While the court in *Farmers* did hold that compensation for work performed cannot be an employee benefit for purposes of the exception for benefit plans, it also held that the retirement and profit-sharing (compensation) prongs should be viewed as an integrated package and, as such, they were unlawful because Farmers could not articulate any legitimate reason for the payment of less compensation to employees once they reached age 65. *Id.* at 1003–05. In contrast, the District's reduction in compensation was part of an integrated retirement package to induce early retirement; the reduction in compensation at age 65 was not based on a discriminatory intent but as part of the entire retirement incentive. Accordingly, the District's plans may constitute lawful bona fide employee benefit plans. *See* A.R.S. § 41–1463(G)(4).

¶ 37 Additionally, the superior court's finding of a discriminatory effect but no discriminatory motive was insufficient to prove a case of disparate treatment. As the Supreme Court has held, disparate treatment occurs when an employer treats some employees less favorably than others because of protected characteristics, but, in such a case, "[p]roof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *see also Hazen Paper,* 507 U.S. at 609–10, 113 S.Ct. 1701 (noting that the disparate treatment theory is available under the ADEA but that the Court has never decided if the disparate impact

theory is available); *Amphitheater Unified,* 140 Ariz. at 85, 680 P.2d at 519.

¶ 38 In *Hazen Paper,* the Court reiterated that "a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role ... and had a determinative influence" on the employer's decision or action. 507 U.S. at 610, 113 S.Ct. 1701. Because "an employee's age is analytically distinct from his years of service," *id.* at 611, 113 S.Ct. 1701, the Court held that "there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age," *id.* at 609, 113 S.Ct. 1701, although such factors may correlate with age, including seniority, wage rates or pension status. *Id.* at 611–13, 113 S.Ct. 1701.

¶ 39 Similarly, the Sixth Circuit in *Lyon* held:

> [The plaintiffs could not cure the] lack of evidence of *intent* by inferring discriminatory animus on the basis of a disparate *effect* on older workers. This is circular, and would render meaningless the ... distinction between disparate-impact and disparate-treatment theories of discrimination [and] would also shift the burden of proof in an age discrimination suit to the defendant, contrary to Supreme Court precedent.

53 F.3d at 139–40 (footnote omitted).

¶ 40 Examining the District's plans as a whole, we agree with the District that its plans are not discriminatory. A VIP plan was offered on three occasions to all employees with ten years of service regardless of age. Among those individuals who are eligible for and choose to participate in a VIP, all are treated equally and receive the same compensation. VIP members who are also in the ERP receive a premium wage because of their ERP enrollment, but nothing in the VIP itself raises or lowers the rate of pay for substitute teachers. The VIPs are not discriminatory.

¶ 41 We reach the same conclusion with regard to the ERP. Those employees who have ten years of consecutive service and who are older than fifty years of age but younger than sixty-five are eligible for enroll-

ment in the ERP. The individual must retire and substitute teach a minimum of one day per year. In exchange, (s)he receives premium pay for substitute teaching for as many as forty days a year. This continues until the ERP ends for each member at age sixty-five when that person no longer has any obligation to substitute teach and (s)he no longer receives a premium wage for any substitute teaching accepted.

¶ 42 The ERP grants a preferential wage based on age and years of consecutive service for a limited period in order to induce District teachers to take early retirement.[8] Although the State contends that ERP members who turn age sixty-five seemingly become less valuable because they command only the standard rate of pay, the more obvious and less sinister explanation is that, at age sixty-five, the agreement that induced a teacher to retire early has ended.

¶ 43 Examination of the claims of the individual plaintiffs illustrates that the ERP does not discriminate based on age. Some of the class members voluntarily opted to take early retirement and consequently received the ERP's benefits, including the premium rate of pay for substitute teaching, until they turned age sixty-five. The fact that other participants in the ERP who had not turned age sixty-five continued to receive the enhanced wage does not mean that those whose participation ended are being discriminated against because of their age. Rather, the younger ERP members are still eligible for the premium rate because they, unlike the ERP members past age sixty-five, have not yet received the full benefit of their bargain with the District.

¶ 44 Those teachers who retired after age sixty-five also have no valid claim that the ERP discriminated against them because of their age. There are two possible reasons why these individuals did not retire before sixty-five and enroll in the ERP: They chose not to join, or they did not have enough consecutive years of service to be eligible.

The former case is simply a matter of personal choice, not the result of discrimination. In the latter case, any discrimination stems from a lack of time in service, not age.

¶ 45 A premium wage for those who meet the ERP requirements and retire early is not age discrimination but an incentive for the senior employee to leave resulting in a monetary savings for the employer. In other words, it confers a benefit on senior employees whose early departure reduces the District's budget by encouraging those teachers with the highest salaries to leave and, if they are replaced, to be replaced by those receiving lower salaries. As one court observed, to have an age-discrimination claim, the employer must have discriminated against the complainants because "they [are] old, not because they [are] expensive." *Allen*, 33 F.3d at 677. Indeed, if the District had not been willing to hire older teachers, most employees by age fifty would have met the service requirement of ten consecutive years. However, those teachers who already were older when hired were not able to work a sufficient number of years before they turned age sixty-five to qualify for the ERP.

¶ 46 Moreover, and as several courts have noted, when employers and employees bargain for a prized option such as an early retirement plan, and its challengers only seek to gain or continue to receive its benefits, it is difficult to perceive the plan as a subterfuge for age discrimination. *See, e.g., Karlen*, 837 F.2d at 317; *Henn*, 819 F.2d at 826–27; *Cipriano*, 785 F.2d at 58–59. If an early retirement incentive must be paid forever, it no longer provides a financial dividend for the employer but a severance bonus available to all employees.

¶ 47 Given our conclusion that neither the VIPs nor the ERP discriminated against the class members on the basis of age, we need not consider the subsidiary issues, and the

---

8. If the ERP imposed only a minimum-age requirement, the District would not expect to realize significant savings because age alone would not guarantee that those with the most years of service (and highest salaries) would enroll. By accelerating the retirement of teachers with at least ten consecutive years of experience who otherwise would remain on payroll, however, the District reduces the cost of employing more-experienced teachers and can replace them with less-expensive teachers.

issues raised by the appeal are moot.[9] The judgment in favor of the State and the award of back pay are vacated. This matter is remanded for entry of judgment for the District.

CONCURRING: DONN KESSLER, Presiding Judge and PHILIP HALL, Judge.

9. The District's "Motion to Strike Portions of [the State's] Combined Reply Brief on Appeal/Answering Brief on Cross Appeal" is denied as moot.